IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| Russ Mehl, Edmund Gross, Trudy Boyer, Steve Anderson, and Gregory Steadman, individually and on behalf of all others similarly situated, | ) ) ) ) ) | Case No. |
| *Plaintiffs* | ) ) | |
| v. | ) ) | |
| BP Energy Company, Southwest Energy L.P., Macquarie Energy LLC, Energy Transfer, L.P., Tenaska, Inc., d/b/a Tenaska Marketing Ventures, MIECO, LLC, and Rockpoint Gas Storage, LLC | ) ) ) ) ) ) ) | |
| *Defendants* | ) ) | |

**CLASS-ACTION COMPLAINT**

Plaintiffs, Russ Mehl, Edmund Gross, Trudy Boyer, Steve Anderson, and Gregory Steadman, individually and on behalf of a class of similarly situated residents of Kansas (the Kansas Gas Service residential class), bring this class action under the Kansas Consumer Protection Act[1] against Defendants, BP Energy Company, Southwest Energy L.P., Macquarie Energy, LLC, Energy Transfer, L.P., Tenaska, Inc., d/b/a Tenaska Marketing Ventures, MIECO, LLC, and Rockpoint Gas Storage, LLC.

**Introduction**

1.  Among other prohibitions, the Kansas Consumer Protection Act (the Act) makes it unlawful for suppliers to: (1) induce consumers into transactions that are excessively one-sided; or (2) profiteer from a disaster.

---

[1] *See* K.S.A. 50-623, *et seq.*; K.S.A. 50-6,106.

1

2. In February 2021, Winter Storm Uri brought sustained and extreme cold weather to Kansas, causing Governor Laura Kelley to proclaim a state of disaster.

3. At the same time, Defendants—all suppliers of natural gas to Kansas natural-gas distributors—charged prices that exceeded more than 100 times, and on one day, more than 200 times, the price of natural gas before Winter Storm Uri hit the State of Kansas.

4. Plaintiffs accordingly bring these claims to recover damages as a result of Defendants' unconscionable practices.

## Parties

5. Plaintiff, Russ Mehl, is a resident of Shawnee, Kansas and is a Kansas consumer, as that term is defined in the Act. Mr. Mehl buys and uses the natural gas that Defendants produce and supply to Kansas Gas Service (KGS) for personal, family, and household needs, including home heating.

6. Plaintiff, Edmund Gross, is a resident of Leawood, Kansas and is a Kansas consumer, as that term is defined in the Act. Mr. Gross buys and uses the natural gas that Defendants produce and supply to KGS for personal, family, and household needs, including home heating.

7. Plaintiff, Trudy Boyer, is a resident of Mulvane, Kansas and is a Kansas consumer, as that term is defined in the Act. Ms. Boyer buys and uses the natural gas that Defendants produce and supply to KGS for personal, family, and household needs, including home heating.

8. Plaintiff, Steve Anderson, is a resident of Leawood, Kansas and is a Kansas consumer, as that term is defined in the Act. Mr. Anderson buys and uses the natural gas that Defendants produce and supply to KGS for personal, family, and household needs, including home heating.

9. Plaintiff, Gregory Steadman, is a resident of Derby, Kansas, and is a Kansas consumer, as that term is defined in the Act. Mr. Steadman buys and uses the natural gas that Defendants produce and supply to KGS for personal, family, and household needs, including home heating.

10. Defendant BP Energy Co. is a for-profit corporation organized in Delaware with its principal place of business in Texas. At all relevant times, BP Energy produced and sold natural gas to Plaintiffs through KGS. BP Energy was aware that the natural gas it sold to KGS was primarily used to service the residential consumer market in Kansas.

11. Defendant Southwest Energy L.P. is a for-profit corporation organized in Delaware with its principal place of business in Texas. At all relevant times, Southwest Energy Co. produced and sold natural gas to Plaintiffs through KGS. Southwest Energy was aware that the natural gas it sold to KGS was primarily used to service the residential consumer market in Kansas.

12. Defendant Macquarie Energy LLC is a for-profit limited liability company organized in Delaware with its principal place of business in Texas. At all relevant times, Macquarie Energy produced and sold natural gas to Plaintiffs through KGS. Macquarie Energy was aware that the natural gas it sold to KGS was primarily used to service the residential consumer market in Kansas.

13. Defendant Energy Transfer, L.P., is a for-profit limited partnership organized in Delaware with its principal place of business in Texas. At all relevant times, Energy Transfer produced and sold natural gas to Plaintiffs through KGS. Energy Transfer was aware that the natural gas it sold to KGS was primarily used to service the residential consumer market in Kansas.

14. Defendant Tenaska, Inc., d/b/a Tenaska Marketing Ventures is a for-profit corporation organized in Delaware with its principal place of business in Nebraska. At all relevant

times, Tenaska produced and sold natural gas to Plaintiffs through KGS. Tenaska was aware that the natural gas it sold to KGS was primarily used to service the residential consumer market in Kansas.

15. Defendant MIECO, LLC is a for-profit limited liability company organized in Delaware with its principal place of business in California. At all relevant times, MIECO produced and sold natural gas to Plaintiffs through KGS. MIECO was aware that the natural gas it sold to KGS was primarily used to service the residential consumer market in Kansas.

16. Defendant Rockpoint Gas Storage, LLC is a for-profit limited liability company organized in Delaware with its principal place of business in Canada. At all relevant times, Rockpoint sold natural gas to Plaintiffs through KGS. Rockpoint was aware that the natural gas it sold to KGS was primarily used to service the residential consumer market in Kansas.

## Jurisdiction & Venue

17. This Court has jurisdiction over plaintiffs' claims under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the matter in controversy exceeds the sum of $5,000,000 and is a class action in which a member of a class of plaintiffs is citizen of a State different from a defendant.

18. This Court has personal jurisdiction over the defendants in this case because they engaged in sales of natural gas to distributors in Kansas that were ultimately paid for by Kansas consumers. For the same reason, venue is appropriate in the District of Kansas.

## General Allegations

### *The Natural Gas Market*

19. Natural gas goes through three basic steps to reach retail users' and consumers' homes. First, natural-gas producers and suppliers drill wells to pump natural gas out of the ground

to process and deliver natural gas to interstate pipelines. Second, interstate pipelines ship the gas from oil and gas fields to various cities and distribution points. Third, and finally, local distributors bring the gas from the pipelines and resell it to businesses and residential customers within their markets.

20. Most producers and marketers of natural gas tie the price that they charge for natural gas to S&P Global's Platts market index (Platts). Platts is a price-reporting agency that, among thing things, collects data on natural-gas trades and publishes both daily and monthly price indexes for various trading locations for natural gas.

21. The majority of natural-gas transactions are made based on Platts-indexed pricing. In 2019, for example, the Federal Energy Regulatory Commission (FERC) reported that 82% of traded volumes in the United States physical natural-gas market were made based on indexed pricing.[2]

22. Though Platts verifies the information that traders report, reporting to Platts is voluntary. As a result, the number of trades that Platts verifies and relies on to establish its index prices is a fraction of the actual natural-gas trades that occur on any given day.

23. Defendants in this case produce a substantial volume of natural gas and, through affiliated or unaffiliated marketers, enter agreements with local distributors to deliver a specific volume of natural gas in advance at a set price. Often, these transactions are made by reference to the "monthly price," or "First of the Month" price, which Platts publishes on the first day of each month. Platts determines the monthly price by calculating a volume-weighted average of all transactions submitted to Platts during the last three trading days of the previous month.

---

[2] *See* Actions Regarding the Commission's Policy on Price Index Formation and Transparency, and Indices Referenced in Natural Gas and Electric Tariffs, 85 Fed. Reg. 83940, at 83941 (Dec. 23, 2020).

24. When local distributors need additional gas, they buy that additional gas from producers and suppliers at the "spot price," or "daily index price," which is the prevailing market rate at the time of purchase. In "spot" transactions, buyers "nominate" the volume of natural gas that they will need for the next day.

25. Platts calculates the daily index by reviewing each day's reported, qualifying trades for next-day delivery and calculating the volume-weighted average price of those transactions. When Platts reports the daily, "spot" price, it reports: (1) the midpoint; (2) the common range; and (3) the absolute range of reported transactions.[3] Most spot purchases are tied to the midpoint.

26. Platts does not update its daily index price on weekends or holidays. Thus, if a holiday falls on a Monday, the Platts index remains the same through the weekend and holiday.[4]

27. Platts' index pricing is also location specific. Relevant here, Platts reports the daily index price for the Southern Star, Tx.-Okla.-Kan, location, which covers "[d]eliveries into Southern Star Central Gas Pipeline's system" in Kansas, among other states.

28. The Southern Star Central Gas Pipeline (Southern Star) is an interstate pipeline that transports natural gas in Kansas, as well as Oklahoma, Missouri, Wyoming, Colorado, Texas, and Nebraska.

### Distributors in Kansas

29. Southern Star delivers natural gas to numerous distributors in Kansas that purchase gas from Defendants based on the Platts index prices for the Southern Star, Tx.-Okla.-Kan location, either directly or through marketers, and ultimately distribute that gas to Kansas residents' homes.

---

[3] *See* S&P Global Platts, *Methodology and Specifications Guide: US & Canada Natural Gas* 4 (2023), *available at* https://www.spglobal.com/commodityinsights/plattscontent/_assets/_files/en/our-methodology/methodology-specifications/na_gas_methodology.pdf.

[4] *See id.*

30. KGS reports that it serves approximately 648,000 customers in 360 communities in Kansas, making it the largest natural gas distributor in Kansas.

31. In forecasting the volume of natural gas that a distributor will need in any given month, distributors like KGS rely heavily on historical usage and weather data. Typically, as temperatures drop in the winter, residential users consume more natural gas to heat their homes.

32. To make a profit, distributors like KGS must include the cost of the natural gas in the ultimate price that they charge their customers. As a result, retail end-users bear the ultimate cost for the natural gas that producers, like Defendants, produce and sell to distributors in Kansas.

*Winter Storm Uri*

33. On February 1, 2021, Platts established the monthly price for natural gas at the Southern Star, Tx.-Okla.-Kan location at $2.520 MMBtu. The spot price for natural gas on the same day was $2.545 MMBtu.[5]

34. Around February 3, 2021, Kansas regional weather reports began predicting colder weather through February 20, and the spot price for natural gas made modest increases. By February 6, the spot price for natural gas had risen from $2.520 to $3.560 MMBtu. By February 9, the spot price rose slightly higher to $3.655 MMBtu.

35. Around the same time, Winter Storm Uri approached and temperatures in Kansas started to deviate substantially from their historical averages. In Wichita, Kansas, for example, the National Weather Service reported the following daily average temperatures and their departure from historical averages[6]:

| Date | Daily Average Temperature | Historical Average | Departure From | Platts Index Spot Price |
|---|---|---|---|---|

---

[5] "MMBtu" is a measure of volume of natural gas expressed in millions of British thermal units.
[6] *See Monthly Station Data [F6]*, Nat'l Weather Serv., www.weather.gov/ict/f6form (choose "2021" from "Year" dropdown and "February" from "Month" dropdown; then click "Retrieve").

7

| Date | Daily Average Temperature (Wichita, KS) | Historical Average (Wichita, KS) | Departure From Historical Average (Wichita, KS) | Platts Index Spot Price (MMBtu) |
|---|---|---|---|---|
| 2/6/2021 Saturday | 26 | 35 | -9 | $3.560 |
| 2/7/2021 Sunday | 16 | 35 | -19 | $3.560 |
| 2/8/2021 Monday | 13 | 35 | -22 | $3.560 |
| 2/9/2021 Tuesday | 12 | 35 | -23 | $3.655 |

36. From Wednesday, February 10, 2021 through Saturday, February 13, as cold temperatures continued to deviate from their historical norm in Kansas, the Platts spot price began to increase dramatically, ultimately reaching $329.595 per MMbtu—a nearly 13,000% increase from the February 1, 2021 spot price:

| Date | Daily Average Temperature (Wichita, KS) | Historical Average (Wichita, KS) | Departure From Historical Average (Wichita, KS) | Platts Index Spot Price (MMBtu) |
|---|---|---|---|---|
| 2/10/2021 Wednesday | 14 | 36 | -22 | $4.030 |
| 2/11/2021 Thursday | 14 | 36 | -22 | $9.620 |
| 2/12/2021 Friday | 7 | 36 | -29 | $44.780 |
| 2/13/2021 Saturday | 8 | 36 | -28 | **$329.595** |

37. Notably, when Platts released the $329.595 daily index price for the first time, it did not release the price until around 9:30 p.m., CST, approximately four-and-a-half hours after Platts ordinarily publishes its pricing.

38. On February 14, 2021, Governor Kelly declared a state of emergency over the sustained and extreme cold weather that Kansans were facing, stating that "[l]ow temperatures

8

with sub-zero wind chills *over the past several days* accompanied by snow, sleet, and freezing rain across the state have caused stress on energy infrastructure."[7]

39. The next day, the Kansas Corporation Commission entered an order directing all jurisdictional natural-gas utilities "to do all things possible and necessary to ensure natural gas . . . services continue to be provided to their customers in the State."[8]

40. In response, natural-gas distributors in Kansas made substantial purchases of natural gas at the prevailing spot price to ensure their storages of natural gas would not run low.

41. Further, February 13, 2021 was a Saturday; February 14, 2021 was a Sunday; and the following Monday, February 15, 2021, was President's Day, a federal holiday. As a result, as temperatures departed even more substantially from their historical averages, and as natural-gas distributors in Kansas continued making spot purchases of natural gas, the Platts spot price for the Southern Star Tx.-Okla.-Kan location remained $329.595 MMBtu through February 16, 2021:

| Date | Daily Average Temperature (Wichita, KS) | Historical Average | Departure From Historical Average (Wichita, KS) | Platts Index Spot Price (MMBtu) |
|---|---|---|---|---|
| 2/14/2021 Sunday | -1 | 37 | -38 | $329.595 |
| 2/15/2021 Monday[9] | -5 | 37 | -42 | $329.595 |
| 2/16/2021 Tuesday | -3 | 37 | -40 | $329.595 |

---

[7] *See* Kansas Executive Department, *State of Disaster Emergency Proclamation* (Feb. 14, 2021), *available at* https://governor.kansas.gov/wp-content/uploads/2021/02/2-14-2021-Extreme-Weather-Disaster-Declaration-Executed.pdf (emphasis added).
[8] Emergency Order, *In the Matter of Record Natural Gas Prices and Potential System Reliability Issues from Unprecedented and Sustained Cold Weather*, Docket No. 21-GIMX-303-MIS, at 3 ¶ B (Kan. Corp. Comm'n, February 15, 2021).
[9] Monday, February 15, 2021, was President's Day, a federal holiday.

42. By comparison, the S&P Global Platts – Gas Daily reported that the national average for natural gas was $57.74.

43. Despite increasing demand for natural gas, the Platts index for the Southern Star, Tx.-Okla.-Kan location between February 13-16, 2021, was based on a mere seven qualifying trades on February 12, 2021 for a total of 50,000 MMBtu.

44. On Wednesday, February 17, 2021, as cold temperature began to show some signs of easing in Kansas, Platts released its updated spot price at the breathtaking, never-before-seen rate of $622.785 MMBtu—a more than 24,000% percent increase from the February 1, 2021 spot price:

| Date | Daily Average Temperature (Wichita, KS) | Historical Average (Wichita, KS) | Departure From Historical Average (Wichita, KS) | Platts Index Spot Price (MMBtu) |
|---|---|---|---|---|
| 2/17/2021 Wednesday | 16 | 38 | -22 | **$622.785** |

45. By comparison, the S&P Global Platts-Gas Daily reported that the national average for natural gas on February 17, 2021 was $79.40.

46. Notably, as demand for natural gas remained high throughout Winter Storm Uri—necessitating hundreds of actual trades for natural gas—the Platts index spot price for the Southern Star, Tx.-Okla.-Kan location on February 17, 2021, was based on just two qualifying trades for a total of 16,000 MMBtu.

47. Further, as the price for natural gas skyrocketed, Defendants began to make force-majeure declarations in their existing agreements with distributors to deliver the natural gas to other distributors at the higher spot price.

48.     Indeed, on numerous occasions, and for nearly every distributor in Kansas, Defendants relied on Winter Storm Uri to declare force majeure on their agreements to deliver a particular volume of natural gas to Kansas distributors at the monthly price. Defendants would then turn around and sell the same natural gas to other distributors who needed to fill or top off their natural-gas storage at the exponentially higher spot price.

49.     Defendants' force-majeure declarations were false. Though demand for natural gas during Winter Storm Uri did increase, distributors in Kansas did not run out of natural gas. Indeed, though numerous distributors and producers relied on stored natural gas, the Southern Star Central Gas Pipeline never lost pressure during Winter Storm Uri, nor did the incremental gas going into the Southern Star Central Gas Pipeline increase in any significant measure.

50.     As a result, the supply of gas throughout Winter Storm Uri did not significantly change, nor did the Southern Start Central Gas Pipeline ever reach a point where it could not deliver the volume of natural gas that had been nominated by its customer-users or distributors.

51.     Regardless, Defendants seized on Winter Storm Uri to redirect a substantial volume of natural gas that it had agreed to sell at lower prices—for example, the $2.520 monthly price for February 2021—and send the same gas to make spot sales to distributors refilling their storage capacities at the $329.595 and $622.785 prices between February 13 and 17, 2021.

52.     On February 18, 2021 the Platts index spot price dropped to $44.530, even though temperatures remained historically abnormal:

| Date | Daily Average Temperature (Wichita, KS) | Historical Average (Wichita, KS) | Departure From Historical Average (Wichita, KS) | Platts Index Spot Price (MMBtu) |
|---|---|---|---|---|
| 2/18/2021 Thursday | 17 | 38 | -21 | $44.530 |

53. Only on February 19, 2021, as temperatures rose and returned closer to their historical averages, did the Platts index spot price similarly approach the February 2021 monthly price or the February 1, 2021 spot price:

| Date | Daily Average Temperature (Wichita, KS) | Historical Average (Wichita, KS) | Departure From Historical Average (Wichita, KS) | Platts Index Spot Price (MMBtu) |
|---|---|---|---|---|
| 2/19/2021 Thursday | 21 | 38 | -17 | $7.945 |
| 2/20/2021 Friday | 29 | 39 | -10 | $4.385 |
| 2/21/2021 Saturday | 39 | 39 | 0 | $4.385 |
| 2/22/2021 Sunday | 44 | 39 | 5 | $4.385 |
| 2/23/2021 Monday | 48 | 40 | 8 | $2.690 |

***Residents Bear the Cost of Winter Storm Uri***

54. In the Kansas Corporation Commission's (the Commission's) February 14, 2021, order that directed distributors "to do all things possible and necessary to ensure natural gas . . . services continue" during Winter Storm Uri, the Commission further ordered that "[e]very . . . natural gas distribution utility that incurs extraordinary costs . . . is authorized to defer those costs to a regulatory asset account."[10]

55. KGS accordingly deferred the extraordinary costs it incurred during Winter Storm Uri and later sought to securitize those costs through an administrative proceeding.

---

[10] Emergency Order, *In the Matter of Record Natural Gas Prices and Potential System Reliability Issues from Unprecedented and Sustained Cold Weather*, Docket No. 21-GIMX-303-MIS, at 3 ¶ D (Kan. Corp. Comm'n, February 15, 2021).

56. On August 18, 2022, the Commission approved a settlement agreement with KGS that allows KGS to recover the extraordinary costs that it incurred as a result of Defendants' pricing during Winter Storm Uri.[11]

57. In a financing order entered the same day, the Commission approved the securitization of $328,043,946 in extraordinary costs and financing costs that KGS incurred as a result of Defendants' pricing during Winter Storm Uri.[12] The same order allocated 78.953% of the cost, or approximately $259,000,000, to KGS's residential class.[13]

58. In December 2022, KGS reported that the average residential customer will see an additional "fixed monthly securitization charge" on its natural-gas bill of $5.64 per month over a 10-year period.[14]

59. Defendants profited handsomely from the incredible costs that the Kansas consumers must now pay for natural gas during Winter Storm Uri. For example, at the end of the first fiscal quarter in 2021, Energy Transfer "reported record financial results" of $5.04 billion, compared to $2.64 billion in the same fiscal quarter in the previous year.[15] Energy Transfer chalked its gains up to "the one-time impacts of the winter storm in February and reliable operations of [Energy Transfer's] flexible, well-maintained asset base[.]"[16]

---

[11] Order Approving Unanimous Settlement Agreement, *In the Matter of the Application of Kansas Gas Service, a Division of ONE Gas, Inc. for the Recovery of Qualified Extraordinary Costs and Issuance of a Financing Order*, Docket No. 22-KGSG-466-TAR, at 2 (Kan. Corp. Comm'n Aug. 18, 2022).

[12] Financing Order, *In the Matter of the Application of Kansas Gas Service, a Division of ONE Gas, Inc. for the Recovery of Qualified Extraordinary Costs and Issuance of a Financing Order*, Docket No. 22-KGSG-466-TAR, at 1 (Kan. Corp. Comm'n, Aug. 18, 2022).

[13] *Id.* at 50 ¶ 62.

[14] Kan. Gas Serv., *Winter Storm Uri Cost Recovery Update: Answers to Top Questions* (Dec. 7, 2022), *available at* https://www.kansasgasservice.com/blog/2022/kgs/winter-storm-uri-cost-recovery.

[15] Energy Transfer, *Energy Transfer Reports First Quarter 2021 Results* (May 6, 2021), *available at* https://ir.energytransfer.com/news-releases/news-release-details/energy-transfer-reports-first-quarter-2021-results.

[16] *Id.*

13

60.     Similarly, Reuters reported on February 21, 2021, that Macquarie reaped "big profits off the winter storms sweeping across Texas and other U.S. states, with the gains from its trading operations single-handedly changing the Australian bank's outlook for the year."[17] The article went on to report that Macquarie traded "large quantities of gas to meet unexpected consumer demand, and could boost the bank's overall profit by about . . . $317 million[.]"[18]

61.     Similarly, BP Energy "[r]eported profit" for the first fiscal quarter of 2021 at "$4.7 billion, compared with $1.4 billion profit for the fourth quarter 2020."[19]

## Class Allegations

62.     In addition to bringing these claims on behalf of themselves, Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23 on behalf of a class defined as: all residential customers whose utilities were served by KGS who must pay for the natural gas Defendants sold through KGS, between February 10, 2021, and February 18, 2021.

63.     Class certification is appropriate under Federal Rule of Civil Procedure 23(a) and (b)(1), (b)(2), or (b)(3).

64.     The class satisfied the numerosity requirement because it is composed of thousands of persons in numerous cities throughout Kansas.

65.     KGS has thousands of residential customers, all of which suffered and will continue to suffer from the unconscionable prices that Defendants charged during Winter Storm Uri.

66.     The number of class members is so large that joinder of all its members is impracticable.

---

[17] Paulina Duran & Jonathan Barrett, *Australia's Macquarie reaps windfall profits from U.S. winter freeze,* REUTERS (Feb. 21, 2021), *available at* https://www.reuters.com/article/us-macquarie-group-outlook/australias-macquarie-reaps-windfall-profits-from-u-s-winter-freeze-idUSKBN2AM01O.

[18] *Id.*

[19] BP p.l.c., *BP p.l.c. Group results, First quarter 2021*, at 2 (Apr. 27, 2021), *available at* https://www.bp.com/content/dam/bp/business-sites/en/global/corporate/pdfs/investors/bp-first-quarter-2021-results.pdf.

67. There are questions of law and fact common to the class and these questions predominate over questions affecting only individual class members.

68. Common legal and factual questions include, but are not limited to:

    a. Whether Defendants supplied natural gas to KGS during Winter Storm Uri.

    b. Whether Defendants charged KGS unconscionable prices during Winter Storm Uri, which KGS passed through to the class.

    c. Whether Defendants profiteered from Winter Storm Uri by charging unconscionable prices to KGS, which KGS passed through to the class.

    d. Whether plaintiffs must ultimately bear the cost of the natural gas for which Defendants charged unconscionable prices.

69. Plaintiffs' claims are typical of the claims of the members of the class because their claims, and the claims of all class members, arise out of the same conduct of Defendants as alleged herein, and all members of the class are similarly affected by Defendants' wrongful conduct.

70. Plaintiffs will fairly and adequately represent the class and have retained counsel competent in the prosecution of Kansas Consumer Protection Act litigation.

71. Plaintiffs have no interests antagonistic to those of other members of the class.

72. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

73. Plaintiffs have standing to bring this action on behalf of the class because they are or during the class period were purchasers of natural gas from Defendants, through KGS, and were injured by Defendants' unlawful conduct.

74. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of natural gas at the pre-Winter Storm Uri rate and the unconscionable prices that Defendants charged.

75. Class action status in this action is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by the members of the class would create a risk of establishing incompatible standards of conduct for Defendants.

76. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the class would create a risk of adjudications with respect to individual members of the class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

77. In the alternative, certification under Rule 23(b)(2) is warranted because Defendants acted on grounds generally applicable to the class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the class as a whole.

78. In the alternative, certification under Rule 23(b)(3) is warranted because questions of law or fact common to members of the class predominate over any questions affecting only individual members, and class-action treatment is superior to the other available methos for the fair and efficient adjudication of this controversy.

## Claims for Relief

### Count I: Violation of the Kansas Consumer Protection Act
### K.S.A. 50-627(b)

79. Plaintiffs incorporate the preceding allegations in this count.

80. Plaintiffs are "consumers" within the meaning of the KCPA because they purchased natural gas for personal, family, and household use.

81. Defendants are "suppliers" within the meaning of the KCPA because they sold natural gas in the ordinary course of business to Plaintiffs, whether or not they dealt directly with Plaintiffs.

82. Defendants' sale of natural gas during Winter Storm Uri was a "consumer transaction" under the KCPA because Defendants sold property to Plaintiffs within Kansas.

83. During Winter Storm Uri, Defendants took advantage of Plaintiffs' inability to protect its interests.

84. Similarly, when Defendants entered spot-price transactions during Winter Storm Uri, they charged a price that grossly exceeded the price at which similar natural gas was readily obtainable in similar transactions by similar consumers.

85. Moreover, the sales of natural gas that Defendants made during Winter Storm Uri forced Plaintiffs to enter a transaction that was excessively one-sided in favor of Defendants.

86. As a result of Defendants' unconscionable acts and practices, Plaintiffs have suffered damages. Specifically, the damages claimed are those amounts the Court determines to be unconscionable, together with the financing costs assessed as a result of those unconscionable charges, with total damages estimated to be in excess of $300 million, and with specific amounts to be assessed to the individual Defendants based on the charges made by each Defendant to KGS, which KGS passed through to its residential consumers.

### Count II: Violation of the Kansas Consumer Protection Act
### K.S.A. 50-6,106 – Profiteering from a Disaster

87. Plaintiffs incorporate the preceding allegations in this count.

88. Natural gas is "home heating fuel," and therefore a necessary property or service for Plaintiffs during a time of a disaster.

89. The Governor of Kansas declared a state of emergency during Winter Storm Uri.

90. Winter Storm Uri was a severe storm, and therefore a disaster within the meaning of the KCPA, that began before the Governor of Kansas declared a state of emergency.

91. Defendants profiteered from a disaster within the meaning of the KCPA because they unjustifiably and substantially:

 a. Increased the price they charged for natural gas by more than 25% than the price at which natural gas was available before the disaster;

 b. Charged prices for natural gas during the disaster that was 25% more than the price at which natural gas was readily obtainable by other consumers; and

 c. Charged unjustifiably high prices for natural gas that were not attributable to any additional costs that Defendants incurred in connection with the sale of the product or service.

92. As a result of Defendants' illegal profiteering, Plaintiffs have suffered damages. Specifically, the damages claimed are those amounts the Court determines that Defendants profiteered, together with the financing costs assessed as a result of those unconscionable charges, with total damages estimated to be in excess of $300 million, and with specific amounts to be assessed to the individual Defendants based on the charges made by each Defendant to KGS, which KGS passed through to its residential consumers.

### Count III: Violation of the Kansas Consumer Protection Act
### K.S.A. 50-634(e) – Attorney Fees

93. Under K.S.A. 50-634, the Court may award consumers reasonable attorney fees where: (1) a supplier commits an act or practice that violates the Act; (2) the prevailing party is the consumer; and (3) an action under K.S.A. 50-634 has been terminated by a judgment or settled.

94. Defendants are suppliers under the Act.

95. Plaintiffs are consumers under the Act.

96. In prosecuting this action, Plaintiffs have incurred, and will continue to incur, reasonable attorney fees.

97. Upon prevailing in this class action under K.S.A. 50-634(d), the court may award plaintiffs' reasonable attorney fees.

98. Plaintiffs request that, upon prevailing in this action, the Court award Plaintiffs the reasonable attorney fees that they have incurred for the work their attorneys have reasonably performed.

WHEREFORE, Plaintiffs request that judgment be entered against Defendants on all claims and request that the Court award the following relief:

A. A determination that Plaintiffs may proceed on behalf of the class;

B. A determination that this action may proceed as a class action under Federal Rule of Civil Procedure 23(b)(1) or, in the alternative, Rule 23(b)(2) or, in the alternative, Rule 23(b)(3).

C. Designation of Plaintiffs as class representatives and designation of Plaintiffs' counsel as class counsel;

D. Actual damages in the amount of unconscionable costs that Defendants imposed on the class throughout Winter Storm Uri in violation of the Act;

E. An award of pre-judgment interest;

F. An award of costs under Federal Rule of Civil Procedure 54(d)(1);

G. A service award to the class representatives;

H. An award of attorney fees under K.S.A. 50-634; and

I. Such other and further relief as the Court deems equitable and just.

Respectfully submitted,

FOULSTON SIEFKIN, LLP

*s/Jay F. Fowler*
Jay F. Fowler, KS #10727
Samuel J. Walenz, KS #29114
1551 N. Waterfront Parkway, Suite 100
Wichita, KS 67206-4466
T: 316-291-9541 | F: 316-267-6345
jfowler@foulston.com
swalenz@foulston.com


Scott C. Nehrbass, KS #16285
Lee M. Smithyman, KS #09391
James P. Zakoura, KS #07644
7500 College Blvd., Suite 1400
Overland Park, KS 66210
T: 913-484-4627 | F: 913-498-2101
snehrbass@foulston.com
lsmithyman@foulston.com
jzakoura@foulston.com

*Attorneys for Plaintiffs*